IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PHILLIP MILLER, et al.,**

    Plaintiffs,

v.

**DELAWARE COUNTY COMMISSIONERS, et al.**

    Defendants.

Case No. 2:13-cv-501
**JUDGE GREGORY L. FROST**
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants Kevin Ullom and Carol O'Brien's motion for summary judgment (ECF No. 57), Plaintiff's response in opposition (ECF No. 77), and Defendants' reply memorandum (ECF No. 78).[1] For the reasons that follow, the Court **GRANTS** the motion.

### I.  FACTS

Plaintiffs Phillip and Cathy Miller are a married couple residing in Delaware County, Ohio. This case involves the investigation, prosecution, trial, and eventual acquittal of the Millers, who were accused of stealing almost $100,000 from Cathy Miller's mother.

####   A.  Background

Cathy Miller is the daughter of Bettie and Lester Robbins. The Robbins have two other adult children: Larry Robbins and Vikki Lutz.

In 1986, Bettie and Lester lived in a duplex alongside the Millers. The Robbins and the Millers lived next door to each other for the better part of the next twenty years. Lester Robbins

---

[1] Plaintiffs expressly concede that Defendant Walter L. Davis III, the only remaining defendant in this case in addition to Ullom and O'Brien, is entitled to summary judgment. The Court therefore will not consider Davis' arguments.

died in 2004 when Bettie was 79, at which time Bettie moved in with the Millers.

The Millers assert that Bettie was in excellent health and able to care for herself when she moved in with them in 2004.  It is, however, undisputed that Bettie was diagnosed with Alzheimer's disease in 2007 and began to show signs of dementia in late 2008.  At some point in 2007, Bettie gave Cathy Miller power of attorney over her affairs.  Bettie moved into an assisted living facility in 2009.

Larry and Vikki lived out of state at all times relevant and saw their parents infrequently.  In 2010, Larry visited Bettie in the assisted living facility, at which time he allegedly became suspicious about Bettie's finances.  Larry had Bettie revoke Cathy's power of attorney and grant him, Vikki, and Vikki's husband, Steve Lutz, power of attorney over Bettie's affairs.  Larry then visited the Delaware County Sherriff's Office and accused the Millers of stealing Bettie's money.

### B. The Investigation

Detective Kevin Ullom was assigned to investigate the Millers' case.  Ullom investigated Bettie's finances in the years following Lester's death.  Ullom summarized his findings in an investigative report (the "Report"), which appears to have been completed on June 1, 2011.  The Report contains the following introduction:

> Bettie L. Robbins is an adult female who has been diagnosed with dementia and probable Alzheimer's.  Bettie is unable to provide care for herself.  During the dates of these offenses Bettie was 79 YOA to 85 YOA.  Bettie previously lived with her husband, Lester Robbins, at 575 South Section Line Rd, which was a home the couple owned.  Lester passed away June 9, 2004. . . .
>
> Bettie and Lester Miller have three adult children, Cathy Miller, Larry Robbins, and Vikki Lutz.  In 2004 Cathy Miller resided at 577 South Section Line Rd with her husband, Phillip Miller.  This address is attached to 575 South Section Line Rd and was also owned by Lester and Bettie.

> After Lester's passing Cathy Miller took over as Bettie's primary caregiver.  During this time Larry Robbins resided out of State and Vikki Lutz, along with her husband Steve Lutz, lived some distance away from Delaware, Ohio.
>
> A Power of Attorney was completed January 24, 2007 naming Cathy Miller Bettie Robbins POA.  Included in this POA agreement Cathy had authority to act on Bettie's behalf to pay debts, collect money owed, etc. . . .
>
> . . .
>
> Larry later learned that Bettie's home had been sold to Phillip Miller's mother, Thelma Miller, and that Bettie had little to no money in her accounts.  Larry and his sister Vikki, along with Vikki's husband, Steve, had the POA revoked and a new POA was created naming all three Bettie's Power of Attorney. . . .
>
> Larry began conducting his own investigation into his mother's finances and found a lot of activity he thought was troubling.  Following Larry's complaint financial records were subpoenaed, and upon a review of those records several questionable transactions were found.

(ECF No. 77-3, at PAGEID # 1668.)

From this section of the Report, the Millers contest the statement that "Cathy Miller took over as Bettie's primary caregiver."  As stated above, the Millers assert that Bettie was in excellent health and did not need a caregiver between 2004 and 2008 (the Alzheimer's diagnosis in 2007 notwithstanding).

Ullom's Report next discusses his investigation into Bettie's finances.  Ullom's findings on Bettie's finances can be summarized as follows:

- Bettie had a joint checking account at JP Morgan Chase Bank.  Between 2004 (Lester's death) and 2006, over $6,000 in checks were written to the Millers, over $6,000 in checks were written to cash, and over $7,000 in credit card purchases appeared to be "questionable" or unrelated to Bettie's care (such as $2,000 to Circuit City and Budget Car Sales, over $1,000 to an event ticket seller, and purchases to Home Depot and to young adult clothing stores, among others).

- Bettie had a checking account at PNC Bank, which reflected over $19,000 in checks written to the Millers between 2004 and 2005, as well as credit card purchases to an insurance company for an account belonging to the Millers, a charge related to a

3

cellular telephone, payments to Home Depot, and payments for airline tickets. Some of these purchases were particularly questionable because, according to Larry, Bettie did not own or use a cell phone during the time period in question.

- A second JP Morgan Chase Bank checking account in Bettie's name also reflected over $6,000 of checks written to the Millers, almost $4,000 in cash withdrawals, large purchases at restaurants (including Domino's Pizza and Buffalo Wild Wings), numerous gasoline purchases, and payments to a technology company for computer parts, among others. According to Larry, Bettie did not own a car or a computer during this time.

- A PNC Diamond Edition credit card in Bettie's name reflected additional charges for gasoline, clothing, products from the Home Depot, and computer software, among others.

- A life insurance policy that belonged to Bettie was transferred to Cathy in August of 2008, after which time Cathy took a loan against the policy for the maximum allowable amount of $1,200.

- Bettie gifted her vehicle, valued at approximated $1,000, to Phillip Miller's sister.

- In January of 2005, Bettie's home was sold to Phillip Miller's mother for $24,466.42. From that sale, a note was created for an additional loan of $23,500 owed to Bettie; however, no efforts appear to have been made to collect on that note.

All in all, Ullom found $94,637.91 in charges believed to be "fraudulent or unrelated to Bettie Robbins' care." (*Id*. at PAGEID # 1670–71.) The Millers dispute Ullom's characterization of the charges as fraudulent or unrelated to Bettie's care; however, they do not dispute the accuracy of the charges and/or transactions.

Following his multi-page description of Bettie's financial activity, Ullom stated: "Investigators attempted to speak with Phillip and Cathy Miller regarding these matters. Both declined to be interviewed about this case." (*Id*. at PAGEID # 1671.) Ullom then requested "[t]hat the Grand Jury review this case and consider an indictment for listed charges." (*Id*.)

Much of the Miller's argument in this case is directed at Ullom's statement in the Report that the Millers declined to be interviewed. The parties agree that Ullom called the Millers' home at some point during the investigation and that Cathy answered. Ullom asked to speak

4

with Phillip.  Ullom told Phillip that he was under investigation and requested that he come to the station for an interview.  Phillip repeatedly asked Ullom to discuss the investigation over the phone.  Ullom stated that he would only discuss the matter in person.  Phillip declined to come into the station for an interview and directed Ullom to the Millers' attorney.

The Millers assert that they would have spoken about the matter on the phone, or through their attorney, such that Ullom's statement in his Report that they "declined to be interviewed" is false.  Ullom asserts that he interpreted Phillip's referral to his attorney to mean that the Millers were declining to be interviewed about the case.

After Ullom completed his Report, he provided the same to the Delaware County Prosecutor's Office.  Assistant Prosecuting Attorney Mark Sleeper was assigned to the Millers' case.  Sleeper reviewed Ullom's Report, decided that prosecution was appropriate, and, in May of 2011, presented the matter to a grand jury.  There is no information before the Court regarding the grand jury proceedings.

On May 27, 2011, the grand jury returned indictments against the Millers for theft in violation of Ohio Revised Code 2913.02.  Arrest warrants were issued.  Police officers came to the Millers' home, where they were outside playing with their six-year-old granddaughter.  The Millers were handcuffed in front of their granddaughter and taken to the Delaware County Jail.

The Millers spent six days in jail.  They were arraigned, they pleaded not guilty, and they were released pending trial.  During this time period the Millers were restricted from leaving the state, speaking to Bettie, and moving homes, among other restrictions.

Shortly thereafter, on June 15, 2011, the Delaware County Prosecutor's Office released a statement designed to bring awareness to the issue of elder abuse.  Non-party Traci Whittaker, the Delaware County Prosecutor's Office Press Information Officer, prepared the statement.  The

statement included the Millers' mug shots and stated, "[m]ost recently, a Delaware County Grand Jury indicted a husband and wife for stealing almost $95,000 over a period of seven years from their 86-year-old mother who was in their care." (ECF No. 77-12, at PAGEID # 1685.) The release went on to state:

> Cathy Miller, 48, and her husband Phillip Miller, 51, both of 431 La Chance Court, were each indicted on May 27 on two counts of theft for taking large amounts of money from Cathy Miller's mother. Cathy's mother was diagnosed with dementia and probable Alzheimer's and was unable to care for herself. The Millers had power of attorney, but it was revoked in April 2010 after family members became suspicious of the victim's financial activity. Delaware County Sheriff's office detectives received the case when family members discovered numerous transactions from the victim's bank accounts that were not relevant to her care.

(*Id.*) The statement was posted to the Delaware County Prosecutor's Office's website.

Defendant Carol O'Brien, the Delaware County Prosecuting Attorney, approved the statement before it was released. O'Brien also had "some conversations" with Sleeper about the strength of the prosecution's case in the time period leading up to the trial. (ECF No. 77, at PAGEID # 1607 (quoting O'Brien Dep. at 41).) Finally, O'Brien recommended that the trial prosecutors talk to the individuals listed on the Millers' witness list before trial, met with Larry, Vikki, and Steven for approximately 45 minutes at some point before the trial, and told the trial prosecutors assigned to the Millers' case to talk to Larry, Vikki, and Steven. The Millers do not assert that O'Brien took any other action related to their case.

The Millers' case proceeded to trial before Judge McGrath of the Common Pleas Court of Delaware County, Ohio. During the trial, the Millers made an oral motion under Ohio Rule of Criminal Procedure 29 and argued that the prosecution's evidence was insufficient to sustain a conviction. Judge McGrath overruled the motion and found that "reasonable minds could come

to different conclusions" regarding the prosecution's evidence.  (ECF No. 57-8, at PAGEID # 1150.)

Judge McGrath ultimately acquitted the Millers of the charges against them.  In so holding, Judge McGrath stated that the prosecution was "[f]ully justified in bringing this case and presenting the case but the Court does not feel in the totality of the evidence it could get beyond a reasonable doubt standard . . . ."  (ECF No. 57-9, at PAGEID # 1158.)  Judge McGrath found that, after hearing the witnesses and learning about the relationship between Bettie and the Millers, the prosecution failed to meet its burden in proving guilt beyond a reasonable doubt.  Judge McGrath acknowledged that the financial records could support a finding of guilt but stated, "[t]he records do not tell the whole story."  (*Id.* at PAGEID # 1156.)

The Millers cite to several pieces of evidence that came out during the trial in support of their position.  As explained in Section II below, however, none of the facts that were uncovered during or in the days leading up to the trial are relevant to this Opinion and Order.

After the trial, Cathy Miller spoke with Traci Whittaker at the Delaware County Prosecutor's Office and asked that the press release about elder abuse be removed from the website, given the acquittal and the fact that the case records had been sealed.  Over a year later, however, Cathy found the same press release on the Delaware County Prosecutor's Office's website.  Cathy wrote a letter to O'Brien requesting that the release be removed.  Cathy asserts that she was able to locate the press release online after that time, although she does not contend that the release was available through the Delaware County Prosecutor's Office's website.

The Millers assert that they suffered lasting effects of the arrest, prosecution, and trial.  Cathy Miller states that she suffered and continues to suffer anxiety and depression.

7

On May 23, 2013, the Millers filed a complaint against Defendants Ullom and O'Brien, in addition to numerous other defendants including the Delaware County Commissioners, assistant prosecutors in the Delaware County Prosecutor's Office, Larry Robbins, Vikki Lutz, and Steven Lutz, among others. The Millers alleged that the investigation against them was incompetent and that they never should have been prosecuted.

The Court dismissed many of the Millers' claims at the motion to dismiss stage. Only the claims for malicious prosecution (state and federal) against Ullom, supervisory liability against O'Brien in her individual capacity, invasion of privacy against O'Brien, and intentional infliction of emotional distress against Ullom and O'Brien remain in this litigation.

Ullom and O'Brien now move for summary judgment on the claims against them. The Court considers the parties' arguments below.

**II.     DISCUSSION**

    **A. Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B. Analysis

#### 1. Federal Claims (Malicious Prosecution Against Ullom and Supervisory Liability Against O'Brien)

The Court first addresses the Millers' claim, pursuant to 42 U.S.C. § 1983, that Ullom violated the Millers' Fourth Amendment right to be free from malicious prosecution. It is undisputed that Ullom acted under color of law at all times relevant. The issue for the Court is whether Ullom violated the Millers' constitutional rights.

The Court set forth the standard for a Fourth Amendment malicious prosecution claim in its February 4, 2012 Opinion and Order:

> The Sixth Circuit recognizes a "constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Barnes v. Wright*, 449 F.3d 709, 715 (6th Cir. 2006) (citing *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). "Such a claim encompasses wrongful investigation, prosecution, conviction, and incarceration." *Id*. at 716. Because the Fourth Amendment only protects individuals against *unreasonable* searches and seizures, a plaintiff asserting a Fourth Amendment §1983 claim "must show, at a minimum, that there was no probable cause to justify his arrest and prosecution." *Id*. (quoting *Thacker*, 328 F.3d at 259) (internal quotations omitted).
>
> . . . In the Sixth Circuit, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Id*. (citing *Higgason v. Stephens,* 288 F.3d 868, 877 (6th Cir. 2002)). In other words, a grand jury indictment that is "fair upon its face" is conclusive proof that Plaintiffs

> cannot state a claim for wrongful investigation, arrest, or prosecution under § 1983.
>
> . . .
>
> The question thus becomes whether the indictment in this case was "fair upon its face." *Barnes*, 449 F.3d at 716. "An exception to the *Barnes* rule applies where the indictment was obtained wrongfully by defendant police officers who knowingly present false testimony to the grand jury." *Cook*, 273 F. App'x at 424.

(ECF No. 41, at PAGEID # 294.)

Applying this authority, the sole issue for the Court with respect to the Fourth Amendment claim is whether Ullom knowingly presented false testimony to the grand jury. As stated above, however, there is no information before the Court regarding the grand jury proceedings. The Millers attempted to obtain the grand jury transcript through the Common Pleas Court of Delaware County, Ohio but their request was denied. This Court similarly denied the Millers' belated request to obtain the transcript during this litigation because the request was untimely.

The Millers acknowledged in their motion to release the transcript that such evidence was vital to their claims. In fact, the Millers acknowledged that their constitutional claims "will almost certainly be dismissed on summary judgment unless they are able to gather information related to the grand jury proceedings." (ECF No. 65, at PAGEID # 1467–68.)

Now, without the benefit of the grand jury transcript, the Millers take a different approach. The Millers argue that their claim rests on the fact that Ullom knowingly provided false information to Sleeper and encouraged Sleeper to present that information to a grand jury. The Millers conclude that, where a police officer knowingly misrepresents facts to a prosecutor and encourages the prosecutor to present those facts to a grand jury, the general rule that a grand jury indictment conclusively determines the existence of probable cause does not apply.

The Millers' argument rests on four premises: (1) that Ullom provided false information to Sleeper to use in deciding whether to pursue an indictment, and (2) that Ullom knew the information was false at the time he provided it to Sleeper, (3) that the information was material, and (4) that the information was provided to the grand jury.  Even assuming the fourth premise to be true, however, the Millers still fail to demonstrate the first three premises of their argument.

The Court begins its analysis by weeding out the irrelevant evidence to which the Millers cite.  Because the focus is on Ullom's knowledge at the time he provided information to Sleeper, facts that became known after the indictment (such as witness testimony at the Millers' trial, for example) are not relevant to the Court's analysis.  *See, e.g., Peet*, 502 F.3d at 564.

Arguments that Ullom failed to conduct an adequate investigation, or that exculpatory evidence existed at the time Ullom provided information to Sleeper, are similarly irrelevant to the Court's analysis.  "Once probable cause is established . . . the police have no constitutional duty to investigate further or to seek potentially exculpatory evidence."  *Martin v. Maurer*, 581 F. App'x 509, 512 (6th Cir. 2014) (citing *Ahlers v. Schebil*, 188 F.3d 365, 371–72 (6th Cir. 1999)).  Because the grand jury found that probable cause existed in this case, the Millers' claim that Ullom should have discovered additional information to present to the grand jury is constitutionally insignificant.  *Cf. Martin*, 581 F. App'x at 509 (finding no constitutional violation where a grand jury found probable cause for an indictment, despite the fact that the investigating officer declined to interview multiple witnesses who corroborated the plaintiff's story that she was not involved in the crime being prosecuted); *Ahlers*, 188 F.3d at 370 (finding no constitutional violation because officers had probable cause to arrest a suspect; the facts that exculpatory evidence was not factored into the decision and that the suspect challenged the key witness' truthfulness did not defeat the probable cause finding).

Although the Millers purport to accept this proposition, most of their argument is simply that Ullom should have performed a better investigation. For example, the Millers argue that Ullom should have interviewed Bettie Robbins' doctor, lawyer, pastor, friends, grandchildren and/or relatives to determine her level of competency in 2004, that he should have discovered more of the facts surrounding the financial transactions listed in his Report, and that he should have interviewed the Millers or their attorney to get their side of the story. The Millers similarly suggest that Ullom should have been suspicious of Larry Robbins as a witness because of Larry's criminal history, motive to lie, and unfamiliarity with Bettie Robbins' day-to-day life, and that Ullom should have verified the truth or falsity of any witness statements by interviewing Bettie herself. None of these assertions are relevant to the issue of whether the grand jury indictment in this case was "fair upon its face" such that it conclusively determines the existence of probable cause. *See Martin*, 581 F. App'x at 509; *Ahlers*, 188 F.3d at 370.

Instead, the sole issue for the Court is whether Ullom knowingly provided Sleeper with false information to present to the grand jury. The Millers identify the following purported false statements in Ullom's Report: (1) "After Lester's passing Cathy Miller took over as Bettie's primary caregiver," and (2) "Investigators attempted to speak with Phillip and Cathy Miller regarding these matters. Both declined to be interviewed about this case." (ECF No. 77-3, at PAGEID # 1668–71). The question becomes whether these statements were materially false and whether the evidence supports a finding that Ullom knew they were false when he made them.

The Millers fail to make this showing with respect to either of Ullom's statements. Regarding the statement that Cathy Miller took over as Bettie's primary caregiver after Lester's passing, the Millers fail to demonstrate that this statement is false. It is undisputed that Bettie, at age 79, moved in with Cathy after her husband's passing. It similarly is undisputed that Cathy

12

became Bettie's primary caregiver at some point after Bettie began to show signs of dementia, which took place after Lester's passing. The statement therefore is not technically false. But even if it was, the Millers presented no evidence that *Ullom knew* that Cathy was not Bettie's primary caregiver immediately after Lester's passing or that Bettie moved in with Cathy as a roommate and not because she needed care. Instead, the Millers argue only that Ullom should have interviewed Bettie or other witnesses and should not "have based his assumptions purely on the rantings of her estranged son who admitted he was out to get his sister," (ECF No. 77, at PAGEID # 1634), which (as explained above) do not establish a constitutional violation.

Regarding the statement that Ullom attempted to speak with the Millers but they declined to be interviewed, the truth or falsity of this statement depends on the way in which one interprets Ullom's contact with Phillip Miller. It is undisputed that Ullom called Phillip and that Phillip declined Ullom's request to come to the station to be interviewed. It similarly is undisputed that Phillip referred Ullom to the Millers' attorney at that time. As such, even if the Millers were willing to speak on the phone or conduct an interview through their attorney, or if Cathy Miller was willing to be interviewed without the Millers' attorney, the discrepancies between those facts and Ullom's statement are minor. The Court cannot conclude that these discrepancies were material to the grand jury's finding of probable cause.

The Millers' only remaining arguments are that Ullom included transactions in his Report (such as the sale of Bettie's home and the fact that she gifted her car to Jackie Brinkley) that, as demonstrated by evidence that the Millers presented at trial, were not fraudulent. This argument does nothing to advance the Millers' position that the grand jury indictment does not establish probable cause. As stated above, evidence that came to light after the indictment is not relevant to the issue before the Court.

The final purported false statement that the Millers identify involves a life insurance policy from United Teacher Associates Insurance Company.  Ullom stated in his Report that "This insurance policy previously existed belonging to Bettie Robbins.  August 18, 2008 the ownership was transferred to Cathy Miller."  (ECF No. 77-3, at PAGEID # 1670.)  The Millers argue that Bettie signed the transfer herself; however, this argument does not render Ullom's statement false.  The Millers' argument in their brief on this point mischaracterizes Ullom's statement in his Report and does not establish a constitutional violation.

Having rejected each of the Millers' arguments regarding Ullom's statements to Sleeper, the Court concludes that the grand jury indictment in this case "conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes*, 449 F.3d at 715.  The Millers cannot demonstrate that an exception to this rule applies.  As such, there can be no malicious prosecution claim, and the Court **GRANTS** Ullom's motion for summary judgment on this claim.

The Court similarly **GRANTS** O'Brien's motion for summary judgment on this claim.  It is entirely unclear how O'Brien's minimal participation in the prosecution could have violated the Millers' constitutional rights.  Even if the Millers are correct that O'Brien's actions are sufficient to invoke supervisory liability under § 1983, which they are not, the Millers do not attempt to explain how or when O'Brien discovered that any of information provided to the prosecution was false.  The Millers' § 1983 claim for malicious prosecution therefore fails.

2.  *Malicious Prosecution Claim (State Law)*

As explained in the Court's February 4, 2014 Opinion and Order, a claim for malicious prosecution under Ohio law differs from federal law in one respect.  That difference, however, does not impact the Court's analysis in this case.

Under Ohio law, the return of an indictment by a grand jury is not preclusive evidence of probable cause, but is instead "prima facie evidence of probable cause" that a plaintiff may rebut. *Deoma v. Shaker Heights*, 68 Ohio App. 3d 72, 77, 587 N.E.2d 425, 428 (Ohio Ct. App. 1990). The Millers attempt to rebut the grand jury indictment in this case by offering the same purported false statements discussed in conjunction with the federal claim. *See* ECF No. 77, at PAGEID # 1641 ("Here, the Millers have offered substantial evidence to demonstrate that the information supplied by Ullom to prosecutors was knowingly false."). Because the Court found that the Millers failed to identify any material, knowingly false statements, however, this argument fails for the same reasons as those set forth above. The parties' dispute about whether Ohio law recognizes a malicious prosecution claim for false statements made to a prosecutor during an investigation is not relevant to the Court's analysis.

The Court accordingly **GRANTS** Ullom's motion for summary judgment on this claim. To the extent the Millers' complaint alleged a claim for supervisory liability under Ohio law against O'Brien that was not addressed in the Court's February 4, 2014 Opinion and Order, the Court similarly **GRANTS** O'Brien's motion for summary judgment on this claim.

### 3. *Invasion of Privacy (Against O'Brien only)*

In their complaint, the Millers allege that O'Brien put the Millers in a false light when she approved the press release about them in connection with elder abuse awareness (the "Release"). O'Brien moved to dismiss this claim on the ground that the Release did not contain any false statements. The Court, however, rejected that argument because the tort protects against more than just false statements. The Court stated: "If the grand jury indictment were obtained by false testimony and Defendants knew of that fact, publicizing the indictment without reference to the false testimony could arguably place Plaintiffs in a 'false light.' " (ECF No. 41,

15

at PAGEID # 307 (citing *Penwell v. Taft Broadcasting Co.*, 13 Ohio App. 3d 382, 385, 469 N.E.2d 1025 (12th Dist. 1984).)

The Millers now propound three theories on which they base their claim: (1) that O'Brien's conduct in allowing the Release to be posted on the Delaware County Prosecutor's Office's website constitutes the tort of "publicity to private life," (2) that O'Brien committed the tort of "false light invasion of privacy" at the time she initially allowed the Release to be published, and (3) that O'Brien committed the tort of "false light invasion of privacy" by allowing the Release to be published years after the Millers' acquittal.

The tort of "publicity to private life" has five elements. A plaintiff pursuing this claim must demonstrate: (1) publicity, (2) that the facts disclosed concern an individual's private life, (3) that the matter publicized was one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities, (4) that the publication was made intentionally, not negligently, and (5) that the matter publicized was not of legitimate concern to the public. *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App. 3d 163, 166–67, 499 N.E.2d 1291 (10th Dist. 1985).

The Millers assert that the facts disclosed in the Release "are those concerning the Millers' finances and private relationship with their mother" such that they concern the Millers' private life. (ECF No. 77, at PAGEID # 1643.) The Court, however, disagrees with this characterization of the Release. Once the grand jury issued the indictment, the facts surrounding the Millers' finances and relationship with Bettie became a matter of public concern such that any publicity surrounding those facts no longer concerned the Millers' private life. The Release—which reports only the indictment and surrounding facts—therefore cannot satisfy the second and fifth elements of the *Killilea* test.

16

The Millers appear to concede this conclusion, but argue that "the public would have no legitimate concern for the Millers or their affairs two and half [sic] years after they were acquitted." (*Id*. at PAGEID # 1643.)  This argument misses the point.  A grand jury indictment and surrounding facts are public issues, regardless of whether the indictment involves an accused's private life.  *See, e.g., U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 753 ("[I]ndictments . . . are public events that are usually documented in court records.")  The indictment and surrounding facts did not become "private" issues the moment the public lost interest in them.  *See id*.; *cf. G.B. v. Rogers*, No. 1:08-cv-437, 2009 WL 1322451, at *11 (S.D. Ohio May 11, 2009) ("There is no privacy right in public records, including court records and the fact of an individual's conviction.").  As such, the Court cannot conclude that publication of the Release years after its initial publication disclosed the Millers' "private life." The Millers' first theory therefore fails.

The Millers' second and third theories similarly fail.  The tort of false light invasion of privacy does not apply to the facts of this case.

The first element of a false light invasion of privacy claim is a falsehood.  Even if the statements made against the plaintiff are technically true, the plaintiff must demonstrate that those statements created a false perception.  *See, e.g., Somogye v. Toledo Clinic, Inc*., No. 3:11-cvv-496, 2012 WL 2191279, at *15 (N.D. Ohio 2012) (quoting *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007 Ohio 2451, 866 N.E.2d 1051, at ¶ 61); *Penwell v. Taft Broadcasting Co*., 13 Ohio App. 3d 382, 385, 469 N.E.2d 1025 (12th Dist. 1984).  The plaintiff also must demonstrate that the false light in which he or she was placed "would be highly offensive to a reasonable person," and that the actor "had knowledge of or acted in reckless disregard as to the falsity of the

publicized matter and the false light in which the other would be placed." *Welling*, 2007 Ohio 2451, at ¶ 61.

Here, despite arguing that the tort encompasses more than just false statements, the Millers attempt to prove their claim by demonstrating "that the press release contained false statements." (ECF No. 77, at PAGEID # 1647.) The Millers specifically point to the statement in the Release that they were indicted "for stealing almost $95,000," which they argue is false because they were indicted for "allegedly" stealing almost $95,000. (ECF No. 77.) This argument is meritless and ignores the definition of the word "indicted."

Next, the Millers point to the statement in the Release that "a Delaware County Grand Jury indicted a husband and wife for stealing almost $95,000 over a period of seven years from their 86-year-old mother *who was in their care*," (ECF No. 77-12, at PAGEID # 1685) (emphasis added), on the ground that Bettie Robbins was the Millers' "roommate" who did not need their care in the years immediately following her husband's death. The Millers make a similar argument regarding the Release's statement that Bettie "was diagnosed with dementia and probable Alzheimer's and was unable to care for herself." (*Id*.) But to the extent that these statements cast a false light on the Millers' caregiving responsibilities in the years between Lester's death and Bettie's dementia/Alzheimer's diagnosis, that falsity itself would not be highly offensive to a reasonable person.

It is clear that the crux of the Millers' claim is not the purported false statements; it is the Millers' contention that the Release "indicates falsely to the public that the Millers are criminals who abuse the elderly." (ECF No. 77, at PAGEID # 1647.) But the root of this argument is the Millers' disagreement with the indictment itself. The Millers believe they should not have been indicted because they were innocent of the criminal charges against them. But the Millers were

indicted. The Release correctly reported that fact. As such, although the Millers disagree with the indictment against them and the conclusions one might draw from the indictment, the Release's publication of the indictment did not place them in a false light.

The Millers next assert that, even if the Release did not place them in a false light when it was initially published, it placed them in a false light when it was republished years after they were acquitted for the crimes charged. Even if true, however, this claim still fails. The Millers presented no evidence that O'Brien had knowledge of or control over the fact that the Release was republished on the Delaware County Prosecutor's Office's website in the years following the acquittal. In their brief on this point, the Millers cite only O'Brien's deposition testimony that she "recently" became aware that the Release was viewable on the website in July of 2014. (ECF No. 77, at PAGEID # 1607 (citing O'Brien Dep. p. 24).) This testimony does not create a question of fact as to whether O'Brien knowingly or recklessly republished the Release after the acquittal so as to place the Millers in a false light. The Court accordingly **GRANTS** O'Brien's motion for summary judgment on the state-law invasion of privacy claim.

*4. Intentional Infliction of Emotional Distress*

Having rejected the Millers' claims for malicious prosecution and invasion of privacy, the Court similarly rejects the Millers' claim for intentional infliction of emotional distress ("IIED"). The IIED claim against Ullom rests entirely on the Millers' argument that Ullom lied to the grand jury, which the Court rejected. The IIED claim against O'Brien rests entirely on the Millers' claim that O'Brien republished the Release years after the acquittal, which the Court also rejected. The Court accordingly **GRANTS** Ullom and O'Brien's motion for summary judgment on this claim.

**III.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Ullom and O'Brien's motion for summary judgment in its entirety.  (ECF No. 57.)  The Clerk is **DIRECTED** to enter judgment accordingly and terminate this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

<u>**/s/ Gregory L. Frost**</u>
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**